# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| VIRGINIA DOWLING, | * | No. 22-1151V |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | Special Master Christian J. Moran |
| v. | * | |
| | * | Filed: August 20, 2025 |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Mark Sadaka</u>, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner;

<u>Tyler King</u>, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

Virginia Dowling alleged that a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination she received on January 14, 2020, caused her to suffer from immune thrombocytopenic purpura ("ITP"), or, alternatively, that the vaccine significantly aggravated her ITP. Pet., filed Aug. 31, 2022. Although she did not receive compensation, she has requested an award of her attorney's fees and costs. The Secretary opposed this award.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

For the reasons explained below, Ms. Dowling has not established that reasonable basis supported the claim set forth in her petition. Although the reasonable standard demands a showing that is less than the preponderance of evidence, Ms. Dowling has not met this standard. Because a finding of reasonable basis is a prerequisite to Ms. Dowling receiving an award of attorneys' fees and costs, her motion is DENIED.

## I.    Evidence about Ms. Dowling's Health

Ms. Dowling was born in 1954. In May 2017, she underwent an operation. As part of this process, her platelet counts were measured at 445,000. Exhibit 8 at 381. Platelet counts typically exceed 140,000. Exhibit 22 (Onno Küster et al., Severe immune thrombocytopenia following diphtheria, tetanus, pertussis and polio vaccination in a 36-year-old Caucasian woman: a case report, 27 EUROPEAN J. OF MED. RES. 63 (2022)) at 64. Around this time, Ms. Dowling's primary care physician was Louis Nardizzi. However, during the litigation, Ms. Dowling encountered difficulties obtaining Dr. Nardizzi's records due to his retirement.

In approximately November 2019, Ms. Dowling and her husband moved from Texas to Baker, Florida. Exhibit 11 (Ms. Dowling's affidavit) ¶ 3; Exhibit 28 (Mr. Dowling's affidavit) ¶ 8. Mr. Dowling asserted that quality medical care was available only if they drove more than one hour. Exhibit 28 ¶ 15. In anticipation of the birth of a grandson, Ms. Dowling and Mr. Dowling planned to get a Tdap vaccination. Exhibit 11 (Ms. Dowling's affidavit) ¶ 5; Exhibit 28 (Mr. Dowling's affidavit) ¶ 9.

Before the vaccination, Ms. Dowling saw a gastroenterologist, Carl Speer, on January 8, 2020. Exhibit 5 at 5-7. Ms. Dowling was requesting a colonoscopy. Id. at 5. As part of his review of systems, Dr. Speer noted: "Blood: easy bruising." Id. On examination, Dr. Speer did not identify any physical abnormalities. Dr. Speer planned to proceed with a colonoscopy, after it was scheduled. Dr. Speer's January 8, 2020 medical records do not memorialize any orders for laboratory studies, such as a complete blood count.

Ms. Dowling and Mr. Dowling obtained a Tdap vaccination from a Walgreens on January 14, 2020. Exhibit 1; see also Exhibit 11 ¶ 6; Exhibit 28 ¶ 11. Ms. Dowling alleged that the Tdap vaccination harmed her.

Ms. Dowling averred that a "few weeks later," a vine nicked her as she was gardening and she "began to bleed quite a bit." Exhibit 11 ¶ 7. This incident appears not to be directly memorialized in any medical record.

2

The next medical appointment occurred on February 6, 2020, when Ms. Dowling consulted an orthopedist, Guy Rutledge III. This medical record is important and merited more attention than the parties gave it in their briefs. Ms. Dowling was seeking attention because, according to a new complaint questionnaire, more than a year earlier, she twisted and fell going up stairs, injuring her left hip, thigh, knee, and leg. Exhibit 9 at 36. Ms. Dowling's "Patient History Questionnaire" asked whether she had recently had any of a series of problems. Id. at 35. Ms. Dowling checked five problems. However, she did not check the box for "Easy bleeding." Id.

Dr. Rutledge created detailed handwritten notes. Exhibit 9 at 33. His dictated and typed report states that Ms. Dowling was injured in a twisting and falling accident on stairs in December 2018, and he had spoken with her by phone after that incident. Dr. Rutledge obtained more details about her orthopedic problems, although these details are not particularly relevant to Ms. Dowling's ITP. Dr. Rutledge examined her and memorialized how she moved when walking and standing. He gave her an injection.

Dr. Rutledge's record does not contain any suggestion of abnormal bleeding or bruising. However, Ms. Dowling averred that she discussed bruises with her orthopedist. Exhibit 11 ¶ 8.

Around this time, the Coronavirus-19 pandemic began to limit people's ability to seek medical attention. Nevertheless, as part of the process for preparing for the colonoscopy, an anesthesia provider evaluated Ms. Dowling on March 4, 2020. Exhibit 5 at 49. The form includes a series of cardiovascular issues. Two boxes are circled but none of the boxes inquire about easy bleeding. Id. Ms. Dowling underwent a colonoscopy performed by Dr. Speer on March 6, 2020. In the report about the colonoscopy, Dr. Speer did not report any abnormal bleeding. Id. at 35-36.

Ms. Dowling averred that in a FaceTime video call with a granddaughter, her granddaughter asked why she was bleeding. Exhibit 11 ¶ 9. Ms. Dowling noticed that there was blood on her leg and, thereafter became concerned about bruises and bleeding. Id. Ms. Dowling does not specify when this FaceTime call happened, although she presented it before her April 8, 2020 appointment.

On April 8, 2020, Ms. Dowling had an appointment with Dr. Speer via Zoom. Exhibit 5 at 1; see also Exhibit 11 ¶ 10. Ms. Dowling complained about generalized abdominal pain radiating to her back and constipation. Dr. Speer recommended a change in her diet to prevent the abdominal pain and increasing

the amount of fiber.  Exhibit 5 at 3.  Dr. Speer also ordered a series of tests to make sure she was not passing a common bile duct stone.  Id.

The abdominal pain continued.  On April 13, 2020, Ms. Dowling sought care at a local emergency room, where her blood was drawn.  Exhibit 2 at 7.  A test on her blood revealed her platelets were 29,000.  The emergency room doctor diagnosed Ms. Dowling with immune thrombocytopenic purpura.

With one exception, which is discussed next, the remaining medical records did not inform the question as to whether the January 14, 2020 Tdap vaccine caused Ms. Dowling's ITP.  The medical records generally discuss how doctors treated her ITP.  For a summary of those records, see Pet., filed Aug. 31, 2022, at ¶¶ 6-11 and Resp't's Rep., filed Sep. 21, 2023, at 3-8.  Ms. Dowling and Mr. Dowling described how Ms. Dowling's ITP affected them.  Exhibit 11 ¶ 18; Exhibit 28 ¶¶ 16-17.

The one set of interesting records were created by a hematologist at Emerald Coast Cancer Center, Harvey Hsiang.  Upon referral from her primary care physician (Exhibit 4 at 34), Ms. Dowling first saw Dr. Hsiang on April 27, 2020.  Exhibit 6 at 1-5.  Dr. Hsiang's history of present illness states "Evidently she has a normal CBC in 1/2019."  Id. at 1.  The basis for the assertion that Ms. Dowling's complete blood count was normal in January 2019 is not readily apparent.  Dr. Hsiang's history continues: "She noticed intermittent skin bruising since 10 months ago."  Id. at 1.  If this account were accurate, then it is likely that Ms. Dowling was experiencing symptoms of ITP before the vaccination.

Ms. Dowling saw Dr. Hsiang approximately six more times.  See Exhibit 6 at 6-61 (range of appointments from May 5, 2020 to September 29, 2020).  Then, on October 7, 2020, outside of the context of an appointment, Dr. Hsiang revised the history.  Instead of stating that Ms. Dowling noticed bruising 10 months before the April 27, 2020 appointment, Dr. Hsiang wrote that Ms. Dowling noticed intermittent skin bruising "2 months ago, not 10 months ago."  Exhibit 6 at 1.  The basis for Dr. Hsiang's correction is not readily apparent.

## II.  **Procedural History**

### A.    **Pre-Petition Phase**

The timesheets of Ms. Dowling's attorney, Mark Sadaka, show that Ms. Dowling and Mr. Sadaka first communicated on August 14, 2020.  Over the next approximately two years, staff in Mr. Sadaka's office collected medical records.  As part of this process, Ms. Sadaka's paralegal sought to collect medical records

from Emerald Coast Cancer Center, starting on February 16, 2021 (two entries). The records were received on February 19, 2021, and analyzed for more than one hour on February 24, 2021. Mr. Sadaka consulted an expert on July 25, 2022.

### B.    Entitlement Phase

Ms. Dowling alleged the January 14, 2020 tetanus vaccine caused or significantly aggravated her ITP. Pet., filed Aug. 31, 2022. She filed medical records over the next few months. The records from Emerald Coast Cancer Center were filed as Exhibit 6 on October 3, 2022. After it appeared that Ms. Dowling had filed most of the relevant medical records, the case was assigned to the undersigned. See Activation and Reassignment Order, issued June 8, 2023.

An Initial Comprehensive Scheduling Order, issued June 15, 2023, set various deadlines. Most importantly, the Initial Comprehensive Scheduling Order required that the Secretary set forth his position by September 14, 2023, and that Ms. Dowling file a report from an expert by January 16, 2024. The Initial Comprehensive Scheduling Order advised the parties that motions seeking to extend these deadlines would be evaluated to see whether the movant showed good cause.

An initial status conference was held on June 26, 2023. Following this status conference, the parties were offered an opportunity to comment upon a draft of instructions for experts. Ms. Dowling was also directed to file an onset affidavit.

Ms. Dowling reviewed the medical records to see whether any doctors associated her tetanus vaccine with her ITP. She did not locate any examples. Pet'r's Status Rep., filed July 14, 2023; see also Timesheets (entry for Jul. 13, 2023). Ms. Dowling answered information about the onset of her ITP in an affidavit filed on August 8, 2023, as Exhibit 18. Ms. Dowling averred that she did not notify the Vaccine Adverse Event Reporting System ("VAERS"). Exhibit 18 ¶ 4. Ms. Dowling further averred that she "was told [her] hematologist filed a VAERS report in 2020. [She was] working with my provider and counsel to obtain a copy of the VAERS report." Id. at 5. However, as discussed below, a VAERS report from the hematologist was never located.

After Ms. Dowling's affidavit mentioned a VAERS report from her hematologist, Mr. Sadaka's paralegal sought additional information from Emerald Coast Cancer Center. Timesheets (entries for Sep. 11, 2023 and Sep. 26, 2023). Additional medical records from Emerald Coast Cancer Center were received on

October 2, 2023, and reviewed for 4.5 hours on October 6, 2023. These records were filed on October 30, 2023 as Exhibit 26.

The Secretary contested Ms. Dowling's entitlement to compensation. Resp't's Report, filed pursuant to Vaccine Rule 4, on September 21, 2023. The Secretary argued that Ms. Dowling had not presented a theory to link the tetanus vaccine to ITP and had not established a medically appropriate timeframe to infer causation. Resp't's Rep. at 10. The Secretary further noted that Ms. Dowling's most recently documented platelet count was from over 30 months before her vaccination, and so it could not be established whether her ITP pre-dated the vaccination. Id. at 2, 10.

Ms. Dowling filed medical literature regarding ITP. Exhibits 20 to 23. She also worked to obtain updated medical records and stated her intention to retain an expert to write a report. See Order, issued Oct. 18, 2023. In the October 18, 2023 status conference, Mr. Sadaka was reminded that the expert report was due on January 16, 2024. Mr. Sadaka responded that he had consulted two hematologists and was waiting for a response. However, Mr. Sadaka's timesheets do not include any notation that he had corresponded with an expert, except for the consultation on July 25, 2022.

In the October 18, 2023 status conference, Mr. Sadaka also discussed the VAERS report. He stated that his office was attempting to obtain it. On October 30, 2023, which is the date that the second set of records from Emerald Coast Cancer Center were filed as Exhibit 26, Ms. Dowling requested that Mr. Sadaka be authorized to issue a subpoena for the production of "correspondence between Petitioner and her medical providers" at Emerald Coast Cancer Center. Pet'r's Mot., filed Oct. 30, 2023. This motion recounts that a staff member at Emerald Coast Cancer Center stated that Emerald Coast Cancer Center switched to a new electronic record management system and that no records of communications from November 1, 2019 to December 31, 2020 had been found. Id. (For frame of reference Dr. Hsiang first saw Ms. Dowling at Emerald Coast Cancer Center on April 27, 2020. Exhibit 6 at 1-5.)

The motion to authorize the subpoena was granted. Order, issued Nov. 2, 2023. Eventually, Mr. Sadaka's paralegal described attempts to get records from Emerald Coast Cancer Center. Exhibit 29 (affidavit), filed on Jan. 22, 2024. According to this affidavit, Shelley from Emerald Coast Cancer Center had

"double check[ed] the archives" but had not located any communications in the system.  Id. ¶ 5.

Pursuant to the June 15, 2023 Initial Comprehensive Scheduling Order, Ms. Dowling's expert report was due on January 16, 2024.  The first post-petition notation in Mr. Sadaka's time entries regarding efforts to obtain an expert report appears to be on January 5, 2024, which is when Mr. Sadaka "perform[ed] [an] expert search for the case."  Timesheets.

Via a motion filed on January 10, 2024, Ms. Dowling requested an enlargement of time from January 16, 2024 to February 26, 2024 to file a report from her expert.  Pet'r's Mot., filed Jan. 10, 2024.  This motion represented that "The expert Petitioner previously engaged in this matter is not able to move forward due to matters unrelated to this case.  On January 9, 2024, Petitioner engaged a new expert in this matter, M. Eric Gershwin MD.  Petitioner's expert needs forty-five days to complete his review of this matter and submit his report."  Id. at 1.  However, the timesheets do not indicate an expert was retained before Dr. Gershwin.  In addition, there is no request for reimbursement for work performed by any expert other than Dr. Gershwin.

Petitioner's January 10, 2024 motion for enlargement of time was denied due to failure to establish good cause as required in Vaccine Rule 19(b).  Order, issued Jan. 11, 2024.  This order stated that Ms. Dowling had failed to state when the original expert was retained and when the original expert declined to participate.

Ms. Dowling renewed her motion for enlargement of time.  Pet'r's Mot., filed Jan. 16, 2024.  This motion represents that: "After Respondent's Rule 4c report was filed on September 21, 2023, Petitioner's counsel reached out to the two potential experts to gauge their availability to work on this matter. Petitioner's counsel reviewed the matter with both potential experts and ultimately engaged one of the hematologists during the last week of October 2023."  Pet'r's Mot., filed Jan. 16, 2024, at 2.  However, there are no indications in the Timesheets that Mr. Sadaka retained an expert in the last week of October 2023.  The renewed motion continues:

> Over the course of the following two months, Petitioner's counsel checked in with Petitioner's expert on his progress and received reassurances that he would be able to complete the report by the January 16, 2024, deadline and should have a draft ready for counsel's review by January 5, 2024. On January 5, 2024,

> Petitioner's counsel did not receive the draft of the report as
> promised and in following up with Petitioner's former expert
> learned that he did not have a draft completed and could not move
> forward with the matter due to issues unrelated to this case.

Pet'r's Mot., filed Jan. 16, 2024, at 2. The January 16, 2024 motion repeats some
of the information presented in the January 10, 2024 motion: "Petitioner's counsel
then reached out to Dr. M. Eric Gershwin to determine his availability and interest
in drafting a report for this matter. Petitioner's counsel engaged Dr. Gershwin on
January 9, 2024, and confirmed with him that he needed forty-five days to review
the materials and submit his report." Pet'r's Mot., filed Jan. 16, 2024, at 2. The
Timesheets corroborate that a paralegal sent case material to Dr. Gershwin on
January 12, 2024. (By way of contrast, no paralegal entries show that a paralegal
sent material to a hematologist or any other expert until this entry.)

Based upon these representations, the deadline for Ms. Dowling's expert
report was extended to the date she proposed, which was March 1, 2024. Order,
issued Jan. 17, 2024. This order questioned whether payment to the hematologist
would be appropriate.

It appears that Dr. Gershwin began working on Ms. Dowling's case
relatively quickly. Dr. Gershwin prepared an invoice, which is dated February 10,
2024. Dr. Gershwin has invoiced for 10 hours of work and his final entry, which is
for 0.8 hours, is for a discussion with Mr. Sadaka.[2] Mr. Sadaka, in turn,
memorialized a discussion with Dr. Gershwin for 0.8 hours on February 7, 2024.
In the following week, Mr. Sadaka and his paralegal communicated with Ms.
Dowling about Dr. Gershwin's findings.

About two weeks later, on March 1, 2024, which was the deadline for Ms.
Dowling's expert report, Ms. Dowling requested additional time. Pet'r's Mot.,
filed Mar. 1, 2024. Ms. Dowling represented that Dr. Gershwin had requested
additional information in early February and she had quickly provided that
information to him. However, Dr. Gershwin had "just informed" Mr. Sadaka that
the requested information was not sufficient. Id. at 1.

---

[2] Documents attached to Ms. Dowling's pending fee motion are not
paginated. Dr. Gershwin's invoice appears as pdf page 64.

This motion for enlargement of time was denied without prejudice to renew. Ms. Dowling was "required to specify what information was necessary for Dr. Gershwin to complete his expert report." Order, issued Mar. 11, 2024.

Ms. Dowling renewed her motion for enlargement of time. She recounted that Dr. Gershwin had asked for information about her onset of symptoms, the bruising she experienced as she was redoing the farmhouse, and information regarding a colonoscopy. Pet'r's Mot., filed Mar. 14, 2024. Ms. Dowling requested an enlargement until April 1, 2024.

Ms. Dowling's renewed motion was granted. Order, issued Mar. 15, 2024 (setting expert report deadline for April 1, 2024). Ms. Dowling was also directed to file any materials that she had provided to Dr. Gershwin.

On behalf of Ms. Dowling, Mr. Sadaka submitted a status report on March 22, 2024. Mr. Sadaka stated that he relayed information from Ms. Dowling to Dr. Gershwin telephonically.[3] In response to this status report, Ms. Dowling was directed to provide an affidavit. Order, issued Mar. 27, 2024. Alternatively, Mr. Sadaka might be required to provide an affidavit. Id.

Ms. Dowling did not submit an affidavit. Rather, she submitted a motion for enlargement of time to file both her affidavit and her expert report. She also stated that she might file a status report as to how she wishes to proceed. Pet'r's Mot., filed Mar. 28, 2024. This motion for enlargement of time was granted. Order, issued Apr. 2, 2024. A status conference was scheduled.

Mr. Sadaka's paralegal communicated with Ms. Dowling on April 8, 2024 "regarding [the] expert report and recent court order." On behalf of Ms. Dowling, Mr. Sadaka informed the case participants that he had not been able to contact Ms. Dowling to discuss with her how she wishes to proceed. Pet'r's Status Report, filed Apr. 11, 2024. (This status report does not recognize that Mr. Sadaka's paralegal had communicated with Ms. Dowling three days ago.) In the ensuing

---

[3] Although Mr. Sadaka's February 15, 2024 time entry shows that he spoke with Ms. Dowling "regarding fact questions posed by expert," none of Mr. Sadaka's ensuing time entries show that Mr. Sadaka had another telephone call with Dr. Gershwin. Dr. Gershwin's only invoice, which is dated February 10, 2024, does not reflect another telephone call with Mr. Sadaka.

status conference, Mr. Sadaka stated that he was concerned that he had been unable to speak with Ms. Dowling.

On April 19, 2024, an order to show cause was entered.  Ms. Dowling needed to confirm her interest in maintaining the case by filing an affidavit by June 3, 2024.  Order, issued Apr. 19, 2024.  About three weeks later, Mr. Sadaka's paralegal drafted a letter to Ms. Dowling "regarding OSC [presumably Order to Show Cause]."  Timesheets (entry for May 16, 2024).

Although Ms. Dowling was obligated to file an affidavit by June 3, 2024, she instead filed a motion to dismiss her case.  This motion was granted.  Entitlement Decision, issued June 6, 2024, 2024 WL 3221523.

### C.    Attorneys' Fees and Costs Phase

Ms. Dowling sought an award of her attorney's fees and costs.  Pet'r's Mot., filed Oct. 18, 2024.  Although this motion discussed the reasonable basis standard, the application of those standards to Ms. Dowling's case was relatively thin.  Id. at 1-4.  The Secretary submitted his boilerplate response, essentially deferring to the assessment of the special master.  Resp't's Resp., filed Oct. 29, 2024.  Part of this response was a lengthy footnote about the standards for analyzing reasonable basis.  However, the Secretary did not analyze how those standards affect Ms. Dowling's argument that her claim was supported by reasonable basis.  Ms. Dowling reiterated her request.  Pet'r's Reply, filed Nov. 1, 2024.

The parties' advocacy regarding reasonable basis was insufficient.  Thus, they were ordered to supplement their positions.  Order, issued Mar. 13, 2025.[4]

The resulting briefs offered some analysis of the evidence in Ms. Dowling's case.  Ms. Dowling maintained that she presented at least a scintilla of evidence to satisfy each of the causation-in-fact elements established in Althen v. Sec'y of

---

[4] Ms. Dowling later seemed to suggest that a special master's request for supplemental briefs was inappropriate in that the special master was making the litigation process more adversarial.  Pet'r's Status Rep., filed June 18, 2025, at 2-3.  However, special masters may seek input from the parties on questions such as reasonable basis.  Sheller v. Sec'y of Health & Hum. Servs., 164 Fed. Cl. 398, 402 (2023), aff'd on non-related grounds and rev'd on non-related ground, 121 F.4th 1301 (Fed. Cir. 2024).

Health & Hum. Servs., 418 F.3d 1275 (Fed. Cir. 2005).[5]  As to the first <u>Althen</u> prong, Ms. Dowling relied upon four medical articles, the Vaccine Injury Table, and the VAERS report from her hematologist.  Pet'r's Supp'l Mem., filed Mar. 31, 2025, at 6.  As to the second <u>Althen</u> prong, Ms. Dowling relied upon her and her husband's affidavits as well as the medical record from Dr. Hsiang.  <u>Id.</u> at 7.  As to the third <u>Althen</u> prong, Ms. Dowling relied upon affidavits, suggesting her ITP began 27 days after the vaccination.  <u>Id.</u> at 8.

The Secretary disagreed.  The Secretary argued that "petitioner's claim never had a reasonable basis.  Petitioner did not file more than a scintilla of objective evidence in support of causation, and therefore had no reasonable basis to bring this claim."  Resp't's Supp'l Resp., filed Apr. 14, 2025, at 7.  The crux of the Secretary's opposition is timing.  The Secretary argued that Ms. Dowling's "actual date of the onset of her symptoms was April 13, 2020, 90 days after petitioner's tetanus vaccination."  <u>Id.</u> at 7-8, citing Exhibit 2 at 7.

Ms. Dowling again maintained her argument that reasonable basis supported her claim that the Tdap vaccine caused her ITP.  Pet'r's Reply, filed Apr. 21, 2025.  She argued that the Secretary's opposition "is an attempt to transform the fee inquiry into a merit-based credibility contest, contrary to the structure, purpose, and precedent of the Vaccine Program."  <u>Id.</u> at 2.  Similarly, she contended that the Secretary "improperly invites the Court to make credibility determinations and weigh competing interpretations of the evidence—tasks reserved for adjudication of entitlement, not threshold fee determinations."  <u>Id.</u> at 7.  She also asserted that she "has submitted robust objective evidence—including medical records, sworn affidavits, a treating physician's VAERS report, and corroborating literature— establishing that the claim was grounded in fact and law at the time of filing."  <u>Id.</u> at 8.

Because Ms. Dowling's arguments in support of reasonable basis rested, in part, upon a treating doctor's VAERS report and because this report was not in evidence, Ms. Dowling and her attorney were given an opportunity to present this evidence.  Order, issued May 2, 2025.

_____

[5] Although Ms. Dowling's petition presented a claim that the Tdap vaccination significantly aggravated an underlying (yet undiagnosed) ITP, her supplemental brief failed to develop any argument regarding significant aggravation.

Efforts to locate this VAERS report were not successful.  On behalf of Ms. Dowling, Mr. Sadaka stated that his office requested medical records from the hematologist's office on September 10, 2023.  Pet'r's Status Rep., filed June 18, 2025, at 1.  The timesheets corroborate that Mr. Sadaka's paralegal communicated with people at Emerald Coast Cancer Center on September 11, 2023.  Timesheets. The paralegal also requested "portal exchanges between client and providers" on September 26, 2023.  Timesheets; accord Pet'r's Status Rep., filed June 18, 2025, at 1.  Mr. Sadaka relayed that in 2023, a staff member at Emerald Coast Cancer Center informed his paralegal that the medical practice had recently transitioned to a new electronic medical records system, which was disrupting access to older documentation.  Id.  Mr. Sadaka did not reference the efforts to subpoena correspondence at the end of 2023 as recounted in his paralegal's affidavit.

Mr. Sadaka also stated that "our office independently searched the publicly available VAERS data files for 2020, 2021, and 2022."  Pet'r's Status Rep., filed June 18, 2025, at 1.  (Although Mr. Sadaka does not state when his office searched, it appears that this search probably took place in June 2025 because time entries do not reflect searching the VAERS databases.)  Mr. Sadaka acknowledges that "we were unable to isolate her individual record."  Id. at 2.

On behalf of Ms. Dowling, Mr. Sadaka restates the position that reasonable basis supported Ms. Dowling's claim.  "Petitioner submits that this good-faith investigation more than satisfies the reasonable diligence standard contemplated under the Vaccine Act and applicable ethical rules."  Id. at 2.  "It would be a grave misapplication of logic and fairness to infer that the report was never filed simply because it is presently unavailable." Id.

With that submission, the motion for attorneys' fees and costs is ready for adjudication.

## III.   **Standards for Adjudication**

In the Vaccine Program, when petitioners receive compensation, they are entitled to an award of their reasonable attorney's fees and costs.  42 U.S.C. § 300aa–15(e).  Petitioners who do not receive compensation can demonstrate their eligibility for an award of attorney's fees and costs "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."  Id.  Here, the Secretary has not contested Ms. Dowling's good faith.  Thus, the preliminary issue is whether "there was a reasonable basis for the claim for which the petition was brought."

A petition in the Vaccine Program must advance five elements, labeled as paragraphs (A) through (E) within 42 U.S.C. § 300aa–11(c).  In determining whether reasonable basis supports the claim, special masters should consider those five elements.  Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337, 1345-46 (Fed. Cir. 2020).  One of the five elements (paragraph (C)) concerns causation.

When determining whether petitioners have satisfied the causation-in-fact aspect of causation in the context of entitlement, special masters look to the three-part test established in Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).  This determination of entitlement requires petitioners to establish their cases with preponderant evidence.  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961-62 (Fed. Cir. 1993) (disagreeing with a dissent that opined the special master had imposed too high a standard).

The assessment of causation in the context of reasonable basis is a little bit the same and a little bit different.  Special masters may structure their assessment of causation in the context of reasonable basis around the Althen prongs.  Sheller v. Sec'y of Health & Hum. Servs., 121 F.4th 1301, 1306 (Fed. Cir. 2024) ("the Althen factors can provide definitional context").  However, the standard of proof in the context of reasonable basis differs.  Petitioners may be found to have satisfied the reasonable basis test upon a showing that a "scintilla" of evidence supports their claim.  Sheller v. Sec'y of Health & Hum. Servs., 121 F.4th 1301, 1307-08 (Fed. Cir. 2024); Cottingham, 971 F.3d at 1346.  However, a "scintilla" of evidence does not automatically confer reasonable basis.  Cottingham v. Sec'y of Health & Hum. Servs., 159 Fed. Cl. 328, 336 (2022) (denying motion for review of decision not to award attorneys' fees and costs), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023).

## IV.  <u>Analysis</u>

The parties raise three potential topics.  These are the evidence, policy, and attorney conduct.  They are discussed below.

### A.  Evidence

Of the five statutorily required elements, the Secretary has challenged the reasonable basis for only one, causation.  See Resp't's Supp'l Resp., filed Apr. 14, 2025.  For the four elements other than causation, ample evidence supports a finding in Ms. Dowling's favor.  Thus, this decision focuses on causation and structures the evaluation of reasonable basis around the three Althen prongs.

Although <u>Althen</u> supplies the structure, the burden of proof for showing reasonable basis is not preponderant evidence.  A scintilla might suffice.

### 1.    *Althen* **Prong One --- Medical Theory**

The first <u>Althen</u> prong requires the presentation of "a medical theory causally connecting the vaccination and the injury."  <u>Althen</u>, 418 F.3d at 1278. This topic is sometimes known as the "can cause" aspect.  <u>See</u> <u>Pafford v. Sec'y of Health & Hum. Servs.</u>, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006).

### a)    *Parties' Arguments*

In support of her position that she had a reasonable basis for claiming that the Tdap vaccine can cause ITP, Ms. Dowling primarily relies upon the Vaccine Injury Table and four articles of which three are case reports.  <u>See</u> Pet'r's Supp'l Mem. at 6.[6]  Ms. Dowling submitted the four articles without an expert report to explain them.  <u>See</u> Notice of Filing, dated Oct. 18, 2023.  Ms. Dowling did not unpack or otherwise elaborate on why the four case reports support her position. She also did not cite any cases in which a special master found the Tdap vaccine causes ITP.

The Secretary presents a minimal objection on this prong.  The Secretary argues that Ms. Dowling "has not offered a medical theory linking her vaccination to her condition."  Resp't's Supp'l Resp. at 8.  The Secretary did not address Ms. Dowling's citation to the Vaccine Injury Table.  The Secretary also did not address the four medical articles Ms. Dowling put forward.

Ms. Dowling did not address the Secretary's contention that she lacked a "medical theory."  <u>See</u> Pet'r's Supp'l Reply.

### b)    *Evaluation*

The brevity of Ms. Dowling's briefing does her no favors.  By citing articles without any discussion, Ms. Dowling seems to be implying that the undersigned should figure out how the evidence supports her case.

---

[6] Ms. Dowling also mentions the VAERS report from her hematologist. However, the VAERS report is discussed in section IV.A.3 below.

The first article Ms. Dowling submitted is an approximately 12-page article, titled "Pathobiology of Secondary Immune Thrombocytopenia." Exhibit 20 (Douglas Cines et al., Pathobiology of Secondary Immune Thrombocytopenia, 46 SEMINARS IN HEMATOLOGY S2 (2009)). This article discusses with complex medical terminology how platelets normally develop and why this process goes wrong, leading to disease. The article states that several infectious agents precede ITP, although neither tetanus, diphtheria, nor pertussis is identified as a potentially causative infectious agent. See Exhibit 20 at S4-S5. With respect to vaccinations, the article states: "Transient but severe thrombocytopenia occurs with an incidence of 1 in 25,000-40,000 vaccinations for measles, mumps, and rubella." Id. at S5. Thrombocytopenia also occurs after other vaccinations, but vaccinations against tetanus, diphtheria, and pertussis are not mentioned.

The authors' linking measles, mumps, and rubella vaccine to thrombocytopenia is consistent with the Secretary's position. The Secretary proposed associating the measles vaccine with ITP in 1995. 60 Fed. Reg. 56289, 56295 (Nov. 8, 1995). This proposal was ultimately based upon "biologic plausibility, case series, uncontrolled observational studies . . . and [a] controlled observational study." Id. After an opportunity for public comment, this proposal became a final rule. 62 Fed. Reg. 7685 (Feb. 20, 1997). The Vaccine Table now creates a presumption that the measles vaccine caused any ITP that arises within 7-30 days. 42 C.F.R. § 100.3(a) ¶ V.A. Ms. Dowling did not attempt to explain how findings concerning the measles vaccine affect a case in which the petitioner received the Tdap vaccine.

The remaining three articles have an advantage in that they are at least about the diphtheria-pertussis-tetanus vaccines. See Exhibit 21 (Bhowmik & Biswas),[7] 22 (Küster), and 23 (Arya).[8] However, as case reports, these articles carry relatively little, if any, evidentiary weight. K.O. v. Sec'y of Health & Human Servs., No. 13-472V, 2016 WL 7634491, at *11-12 (Fed. Cl. Spec. Mstr. July 7, 2016) (citing appellate precedents regarding case reports).

---

[7] Arijit Bhowmik & Tamoghna Biswas, Immune Thrombocytopenia Following Diphtheria-Pertussis-Tetanus and Oral Polio Vaccine, 53 INDIAN PEDIATRICS 934 (2016); filed as Exhibit 21.

[8] L.S. Arya et al., Thrombocytopenic Purpura Following DPT Vaccination, 10 PEDIATRIC HEMATOLOGY AND ONCOLOGY 381 (1993); filed as Exhibit 23.

From Ms. Dowling's perspective, the most useful portion of any of these case reports might be a passage in which the authors mention different theories: "David and Shoenfeld recently summarized potential pathways how vaccines could lead to ITP [23]. These include molecular mimicry, epitope spreading, and finally polyclonal activation, especially in cases of attenuated virus stimulation." Exhibit 22 (Küster) at 4.

Overall, the evidence and arguments advanced regarding the first Althen prong are very weak. They fall well short of the preponderance of level standard. But, in considering whether reasonable basis supports the claims set forth in the petition, the evidentiary standard is that a mere scintilla may support a finding of reasonable basis. Ms. Dowling's evidence is more than nothing. Cf. Cottingham, 971 F.3d at 1346 (holding that special master erred in saying "no evidence"). However, the evidence is barely more than nothing.

## 2. *Althen* Prong Three – Timing

In the context of entitlement, the timing prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013). Thus, consistent with Sheller, which sanctioned the use of Althen's structure, the timing prong will be divided into two parts. However, the burden of proof for reasonable basis remains lower than the preponderance of the evidence standard.

### a) *Medically Acceptable Time*

For the medically acceptable time, Ms. Dowling relies upon two sources of information: the Vaccine Injury Table and a website. Pet'r's Supp'l Mem. at 8. The website is not evidence. See Vaccine Rules, Supplement regarding Electronic Case Filing, ¶ 31(c) ("Neither a hyperlink, nor any site to which it refers, will be considered part of the record"). Thus, it is not considered.

However, the Vaccine Injury Table is more useful. The Secretary recognizes that 7-30 days is an appropriate amount of time for which a measles vaccine to cause ITP. 42 C.F.R. § 100.3(a) ¶ V.A. A close reading of the Secretary's supplemental brief shows that the Secretary did not challenge the assertion that an interval of up to 30 days is appropriate for causation. See Resp't's Supp'l Resp. at 7-8.

Accordingly, Ms. Dowling has a reasonable basis for asserting that 7-30 days is an appropriate interval for which a Tdap vaccine might cause ITP.

> b)    *Onset of ITP*

The second part of the third <u>Althen</u> prong is determining when a vaccinee began developing the disease.  She asserts that she "has submitted two affidavits illustrating that a medical professional observed her bruising within 27 days of her vaccination."  Pet'r's Supp. Mem. at 8, citing Exhibits 18 and 28.  She also relies upon Dr. Hsiang's (corrected) medical record.

The relevant evidence is not consistent.  Ms. Dowling may accurately cite to <u>affidavits</u> in which her husband and she assert that orthopedist Rutledge noticed she had excessive bruising when Dr. Rutledge saw her in February 2020.  <u>See</u> Exhibit 11 ¶ 8; Exhibit 28 ¶ 12.[9]  However, Dr. Rutledge's February 6, 2020 <u>medical record</u> does not mention this observation.  <u>See</u> Exhibit 9 at 31.  It appears that Dr. Rutledge obtained information conscientiously and the lack of notation in his medical record suggests that Ms. Dowling did not talk about easily bruising with him.  <u>See</u> <u>Cucuras v. Sec'y of Health & Human Servs.</u>, 993 F.2d 1525, 1528 (Fed. Cir. 1993); <u>Bradley v. Sec'y of Health & Hum. Servs.</u>, 991 F.2d 1570, 1574 (Fed. Cir. 1993) (holding a special master was not arbitrary in reasoning that the absence of notation in a contemporaneous medical record suggested petitioner's testimony was not accurate).  Moreover, in her own questionnaire, she did not check the box for "easy bruising." Exhibit 9 at 35.

The other evidence on which Ms. Dowling relies is Dr. Hsiang's notes.  More specifically, she relies upon the statement that when Dr. Hsiang saw her on April 27, 2020, she had noticed intermittent skin bruising "since 2 months ago." Exhibit 6 at 1.  Although the Secretary noted this change, (Resp't's Supp'l Resp. at 3), the Secretary did not propose that Dr. Hsiang's original note was more accurate than the revised note.

The Secretary contends that: the "contemporaneous medical records here, created when petitioner first sought care for her symptoms and medical condition, provide reliable, trustworthy, and persuasive evidence.  Petitioner's actual date of

---

[9] Although Ms. Dowling cited a different affidavit (Exhibit 18), her assertions regarding Dr. Rutledge are found in Exhibit 11.

the onset of her symptoms was April 13, 2020." Resp't's Supp'l Resp. at 7. This argument appears to be in error in two respects, one more important than the other.

The more trivial mistake is stating that on April 13, 2020, Ms. Dowling first sought care "for her symptoms." On that date, Ms. Dowling went to the emergency room for abdominal pain. Exhibit 2 at 7. (Actually, she first reported abdominal pain to Dr. Speer on April 8, 2020. Exhibit 5 at 1.) It is not readily apparent that abdominal pain is a manifestation of ITP. Rather, it appears that Ms. Dowling's low platelets were detected by happenstance after the emergency room doctors ordered a complete blood count.

Regardless, the Secretary's more serious misstatement is that the Secretary is equating the date the ITP was detected with the date of onset. However, those two events are not always equivalent. See Rocha v. Sec'y of Health & Hum. Servs., No. 16-241V, 2024 WL 752787, at *33 (Fed. Cl. Spec. Mstr. Feb. 1, 2024) (stating "As a matter of logic, a doctor's detection of a disease does not establish the date the disease began" and citing appellate cases affirming findings regarding date of onset). Thus, the April 8, 2020 test results show that Ms. Dowling was suffering from ITP on that day. But, they provide little guidance as to when Ms. Dowling's platelet counts began to decline.

Medical records relevant to the onset of Ms. Dowling's ITP can be summarized:

| Item | Date | Source | Notation | Significance | Cite |
|------|------|--------|----------|--------------|------|
| 1 | 1/8/2020 | Dr. Speer | "Blood: easy bruising" | ITP before vaccination | Ex. 5 at 5 |
| 2 | 1/14/2020 | Walgreens | Date of vaccination | | Ex. 1 |
| 3 | 2/6/2020 | Dr. Rutledge | Box for "easy bleeding" NOT checked | Not suffering from ITP. | Ex. 9 at 35 |
| 4 | 3/4/2020 | Anesthesia provider | No information about bleeding recorded. | Unclear | Ex. 5 at 49 |

| 5 | 4/13/2020 | Hospital blood draw | Platelets measured 29,000 | Suffering from ITP | Ex. 2 at 9 |
|---|---|---|---|---|---|
| 6 | 4/27/2020 | Dr. Hsiang | "intermittent skin bruising since 10 months ago" | ITP before vaccination | Ex. 6 at 1 |
| 7 | 10/7/2020 | Dr. Hsiang | Correction: "2 months" before first appointment | ITP started about Feb. 27, 2020 | Ex. 6 at 1 |

Thus, some medical records support a finding that Ms. Dowling's ITP (as manifested by bruising) started before the vaccination. These are Dr. Speer's January 8, 2020 report and Dr. Hsiang's original history. If these medical records were accepted as accurate, then Ms. Dowling could not prevail upon a claim that the January 14, 2020 vaccination caused her ITP.

On the other hand, information from Dr. Rutledge's office shows that Ms. Dowling's easy bruising started after their February 6, 2020 appointment. A date after February 6, 2020 is also consistent with Dr. Hsiang's revised history that implies Ms. Dowling's easy bruising started around February 27, 2020. Although an onset of February 27, 2020 makes Ms. Dowling's claim that the Tdap vaccine caused her ITP logically possible (in the sense that the vaccination preceded onset), this potential onset is outside of the 30-day window proposed as the medically acceptable interval.

### 3.    *Althen* Prong Two – Logical Sequence

Ms. Dowling argues that "it is evident that Ms. Dowling has established a clear cause-and-effect relationship showing that the vaccine in question might have legally triggered her condition ITP." Pet'r's Supp'l Mem. at 7. For evidence, she relies upon some items that have already been discussed, such as the Vaccine Injury Table and the evidence regarding the onset of her easy bruising. She also adds "her hematologist's intention to report her injury to VAERS." Id.; accord Pet'r's Supp'l Reply at 2 ("a treating physician's contemporaneous VAERS report").

19

Despite Ms. Dowling's assertion that her claim was "supported by . . . a VAERS report from her treating physician" (Pet'r's Reply at 9), Ms. Dowling did not submit any VAERS report even when given an additional chance.  Pet'r's Status Rep., filed June 18, 2025.  Ms. Dowling laments that she could be improperly burdened with "disproving an unverifiable negative."  Id. at 2.

According to the Federal Circuit, special masters should consider "evidence" when assessing whether reasonable basis supports the claim set forth in the petition.  Simmons v. Sec'y of Health & Hum. Servs., 875 F.3d 632, 636 (Fed. Cir. 2017).  As the party seeking compensation in the form of an award of attorneys' fees and costs, Ms. Dowling bears the burden of presenting evidence.  McKellar v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 297, 305 (2011).

Here, the only evidence about a VAERS report is Ms. Dowling's August 4, 2023 affidavit in which she averred "she was told that [her] hematologist filed a VAERS report in 2020."  Exhibit 18 ¶ 5.  In the Vaccine Program, the Federal Rules of Evidence do not restrict the admissibility of evidence.  42 U.S.C. § 300aa–12(d)(B).  Thus, Ms. Dowling's hearsay statement constitutes "evidence," that must be considered.  James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1381 (Fed. Cir. 2021).

How valuable is a statement that some unidentified person told a petitioner that a doctor would file a VAERS report?  It counts as a scintilla of evidence, but it is not very useful.  Chuisano v. Sec'y of Health & Hum. Servs., No. 07-452V, 2013 WL 6234660, at *23 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (finding a lack of reasonable basis despite petitioner's attorney assertion that an expert told him a claim was viable), mot. for rev. denied, 116 Fed. Cl. 276 (2014).  Without actually reviewing the VAERS report (assuming one was filed), there are too many unanswered questions about it.

### 4.    Overall Assessment of the Evidence

In sum, Ms. Dowling's evidence that the Tdap vaccine caused her ITP is very weak.  Ms. Dowling did not support her claim with the report from an expert, despite Mr. Sadaka's consultation with at least three experts.  Ms. Dowling has not identified any medical record in which a treating doctor supports a finding that the Tdap vaccination caused her ITP.  Pet'r's Status Rep., filed July 14, 2023.

The general infirmity of evidence pertains to each of the Althen prongs.  Her best evidence to demonstrate that the Tdap vaccine can cause ITP is a set of three case reports, which are a weak form of evidence.  Her evidence regarding timing /

<u>Althen</u> prong three (the onset of bruising in the appropriate timeframe) consists of affidavits. These affidavits are inconsistent with two medical records created in 2020. Her evidence regarding <u>Althen</u> prong two is an under-oath statement about a VAERS report that is not in evidence.

To be sure, to have a reasonable basis for her claim, Ms. Dowling does not have to prove her claim with preponderant evidence. A scintilla of evidence "could provide sufficient grounds for a special master to find reasonable basis." <u>Cottingham</u>, 971 F.3d at 1346. However, a scintilla of evidence does not mandate a finding of reasonable basis. Even at this lower level of proof, special masters may decline to find reasonable basis. <u>Cottingham v. Sec'y of Health & Hum. Servs.</u>, 159 Fed. Cl. 328, 336 (2022) (denying motion for review of decision not to award attorneys' fees and costs), <u>aff'd without op.</u>, 2023 WL 7545047 (Fed. Cir. 2023).

When considered as a whole, the evidence does not support a finding of reasonable basis. Given that the entirety of Ms. Dowling's evidence does not support a finding of reasonable basis, it also follows that the evidence at the inception of the case also did not support a finding of reasonable basis. Thus, because of this evidentiary finding, Ms. Dowling is not eligible for an award of attorneys' fees and costs.

## B.　Policy Arguments

The foregoing analysis focused on the evidence. However, both parties appeal to Congressional intent. Ms. Dowling contends: "Congress intended that reasonable, good-faith claims be supported through fee awards even when compensation is denied, recognizing that without such support, access to the [Vaccine] Program would be illusory for many." Pet'r's Supp'l Mem. at 8. Later, Ms. Dowling adds that a denial of her attorneys' fees "would create a chilling effect on similarly situated petitioners, particularly those with complex but good-faith claims supported by competent counsel and credible records." Pet'r's Supp'l Reply at 5.

By way of contrast, the Secretary emphasizes how unsuccessful cases can burden the system:

> Congress's inclusion of the objective reasonable basis requirement in Section 15(e) of the Act evinces its intent to encourage petitioners' attorneys to perform fundamental due diligence and pursue claims that have some basis in fact, science, and law.

> Enforcement of this intent has become all the more important in
> recent years as the Program faces an ever-burgeoning docket with
> limited resources. Each petition that is filed carries transaction costs
> for both the Program and the Court. With a statutorily limited
> number of special masters, the time and resources that must be
> devoted to disposing of cases with no reasonable basis reduces the
> Court's ability to focus on meritorious claims and delays
> compensation in those cases.

Resp't's Supp'l Resp. at 9 (citations omitted).

To large extent, these arguments miss their mark.  As explained at length in Cottingham v. Sec'y of Health & Hum. Servs., No. 15-1291V, 2021 WL 6881248, at *24-26 (Fed. Cl. Spec. Mstr. Nov. 27, 2021), mot. for rev. denied, 159 Fed. Cl. 328 (2022), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023), the Federal Circuit has sometimes resolved cases in ways that encourage attorneys to represent petitioners in the Vaccine Program and has sometimes resolved cases in ways that discourage attorneys from representing petitioners in the Vaccine Program.  What matters more than the policy-based arguments is the evidence.  And, for reasons explained above, the evidence is lacking.

## C.    Attorney Conduct

Arguably, whether the way the attorney conducts the litigation affects the evaluation of reasonable basis could be unclear as Federal Circuit cases may have reached opposite results.  First, in Simmons, the Federal Circuit considered a situation in which Mr. Simmons consulted a law firm, disappeared for about two years, and reappeared shortly before the time set in the statute of limitations expired.  The attorney filed the petition but did not submit medical records.  Mr. Simmons's attorneys sought an award of attorneys' fees, arguing, in part, that they filed the case when they thought it had merit and not filing the case within the period set by the statute of limitations would have been tantamount to an ethical violation.  The Federal Circuit stated that an evaluation of reasonable basis is "an objective inquiry unrelated to counsel's conduct."  875 F.3d at 636.  Therefore, the Federal Circuit affirmed the judgment, denying an award of attorneys' fees and costs.

Next, in Sheller, the Federal Circuit reviewed a situation in which Mr. Sheller asserted that vaccines caused his son's death due to a Triple Risk Model for sudden infant death syndrome.  When Mr. Sheller filed his petition, one special master had credited an opinion advanced by a pathologist, Douglas Miller, in

Boatmon v. Sec'y of Health & Hum. Servs., No. 13-611V, 2017 WL 3432329 (Fed. Cl. Spec. Mstr. July 10, 2017), mot. for rev. granted and decision rev'd, 138 Fed. Cl. 566 (2018), aff'd, 941 F.3d 1351 (Fed. Cir. 2019). When Mr. Sheller's case was pending, the special master's decision in Boatmon was overturned. Thereafter, Mr. Sheller dismissed his case without presenting a report from Dr. Miller. In reviewing a judgment that had denied Mr. Sheller's request for attorneys' fees and costs, the Federal Circuit stated that "it [was] reasonable for Petitioner to postpone additional evidence development as to the application of the Triple Risk Theory to this case until our decision in the Boatmon appeal." Sheller, 121 F.4th at 1308. Thus, it appears that the Federal Circuit excused the absence of "additional evidence" that would have linked the Triple Risk Theory to Mr. Sheller's case. Although the Federal Circuit does not use the term attorney conduct in this context of Sheller, Mr. Sheller's attorney had decided to delay the presentation of a report from Dr. Miller. Sheller, 2022 WL 4075948, at *4 (Dr. Miller stated "I could write a report based on statistics from Dr. Kinney's work ... But this gets us no further than Boatmon and we are all waiting [for] the appellate court to issue a decision . . . . Let me know if you want me to do more.")

Therefore, out of an abundance of caution, the arguments regarding attorney conduct are considered. Initially, Ms. Dowling said very little, if anything, about the actions of her attorney. Instead, Ms. Dowling focused upon the evidence. See Pet'r's Supp'l Mem. The Secretary, too, primarily focused upon the evidence. See Resp't's Supp'l Resp. However, near the end of the Secretary's brief, he states: "The contemporaneous medical records, which had been obtained by petitioner's counsel prior to the filing of this claim, fail to support an onset of [Ms. Dowling's] ITP symptoms at a time potentially reasonable for vaccine causation." Resp't's Supp'l Resp. at 8-9. Then, in the conclusion, the Secretary argued that the Vaccine Act's reasonable basis provision is intended "to encourage petitioners' attorneys to perform fundamental due diligence." Id. at 9. The Secretary supported this position by citing, in a footnote, a case issued in 1993, a case issued in 2014, and a case issued in 2013. Id. at 9 n.6.

After the Secretary appeared to suggest that Ms. Dowling's attorney may not have acted with diligence, Ms. Dowling answered that challenge. In a brief written by Mr. Sadaka, Ms. Dowling asserted: "Her counsel acted diligently and in good faith, assembling a record that clearly satisfied the standard for reasonable basis at the time of filing." Pet'r's Supp'l Reply at 2. She added:

Counsel reviewed and submitted expert support, provided relevant literature, and ultimately determined, reasonably, that this claim merited submission for adjudication.

Ms. Dowling's case is not a matter of "fundamental due diligence" gone awry. It is a case where due diligence was exercised, the factual record assembled, and a claim pursued in good faith based on evidence that, while ultimately insufficient to warrant compensation, was unquestionably sufficient to support a reasonable basis.

Id. at 4.[10]

Again, it is not entirely clear whether counsel's diligence is part of the reasonable basis inquiry. As explained in parts IV.A.-B. above, an examination of the evidence and policy-based arguments leads to the conclusion that Ms. Dowling's claim lacked a reasonable basis throughout its pendency. Nevertheless, because the parties have raised the question of counsel's diligence, the following comments are offered.

Ms. Dowling's attorney could have shown more diligence in two respects: obtaining the VAERS report that Ms. Dowling described and consulting an expert.

VAERS report. With the benefit of hindsight, it appears that counsel could have done more earlier to search for the missing VAERS report. Whether a doctor, a nurse, or a petitioner has informed government officials who monitor potential side effects from vaccines about the events in a petitioner's life is potentially important. Thus, experienced attorneys (such as Mr. Sadaka) could be expected to inquire about VAERS reports relatively early in the process of gathering information.

Here, Ms. Dowling first consulted Ms. Sadaka's office in August 2020. Mr. Sadaka's office obtained records from the hematologist in February 2021. It appears that counsel may have first learned that Ms. Dowling believed her hematologist submitted a VAERS report about her situation when Ms. Dowling answered questions posed to her on the template affidavit. This was in August 2023. After Ms. Dowling submitted her onset affidavit, which disclosed the

---

[10] The basis for the statement that "counsel . . . submitted expert support" is not readily apparent. Ms. Dowling did not submit a report from an expert.

potential VAERS report, staff in Mr. Sadaka's office gathered additional information from Emerald Coast Cancer Center.  In September 2023, a staff member from Emerald Coast Cancer Center advised Mr. Sadaka's office that the office "had recently undergone a transition to a new electronic medical records system."  Pet'r's Status Rep., filed June 18, 2025, at 1.  Regardless, Emerald Coast Cancer Center produced updated records.  See Exhibit 26, filed Oct. 30, 2023.  More efforts took place in December 2023-January 2024.  Exhibit 29.

Ms. Dowling explains the lack of production of the VAERS report is because Emerald Coast Cancer Center changed its system for electronic medical records.  See Pet'r's Status Rep., filed June 18, 2025, at 2 ("the absence of the report is most plausibly attributed to known technological issues at the provider's facility").  But, these technological issues that were "recent" in September 2023 could have been avoided if a request had been made in February 2022, when Mr. Sadaka's office received other records from Emerald Coast Cancer Center.[11]  Of course, if the hematologist never submitted a VAERS report, then the date of requesting the VAERS report is immaterial.

Expert Review.  Ms. Dowling's claim that she was entitled to compensation ultimately floundered upon her failure to obtain a report from an expert.  See Order to Show Cause, issued Apr. 19, 2024; Pet'r's Mot. to Dismiss, filed June 3, 2024.  Without an expert's support, Ms. Dowling could not prevail upon her causation-in-fact claim.  See 42 U.S.C. § 300aa–13.[12]

As an attorney with a great deal of experience in the Vaccine Program, Mr. Sadaka should have understood that Ms. Dowling was likely to receive compensation if and only if she supported her claim with the report from an expert.  Afterall, in support of her arguments with respect to attorneys' fees, Ms. Dowling has not cited any cases in which petitioners have prevailed upon a theory that the

---

[11] Moreover, any technical problems at Emerald Coast Cancer Center, which allegedly sent the VAERS report, would not explain Mr. Sadaka's failure to identify a record about Ms. Dowling in publicly available files from the government, which should have received the VAERS report.

[12] In theory, Ms. Dowling could have prevailed on her claim for entitlement if she had support from a treating doctor.  But, she did not produce any such evidence.

Tdap vaccine caused them to suffer ITP.  Thus, Ms. Dowling could not rely upon a track record of successful claims in the Vaccine Program.

Before Mr. Sadaka filed the petition on Ms. Dowling's behalf, Mr. Sadaka consulted an expert.  Timesheets (entry for July 25, 2022).  Mr. Sadaka's time entry does not identify the expert.  The pending application for fees does not request reimbursement for any expert, other than Dr. Gershwin.  As pointed out previously, Ms. Dowling did not support her claim with a report from an expert.  The lack of submission of an expert report allows for an inference that the expert did not produce a report supportive of Ms. Dowling's claim.

Thus, the ensuing question---assuming that Mr. Sakada had sought and not received a supportive opinion from an expert <u>before</u> filing the petition, why did Mr. Sadaka file the petition?[13]  After Mr. Sadaka filed the petition and searched for an expert more comprehensively, Ms. Dowling acknowledged that she could not prevail upon her claim that the Tdap vaccine caused her ITP.  <u>See</u> Pet'r's Mot. to Dismiss.  Ms. Dowling's assessment of the strengths and weaknesses of her case in June 2024 was based upon only evidence that she had collected (or not collected).  At the time of dismissal, the Secretary had not submitted any evidence to refute or to undermine Ms. Dowling's claim.  In short, there is at least an argument to be made that Mr. Sadaka's failure to confirm an expert could support the claim that Ms. Dowling's January 14, 2020 Tdap vaccination caused her to suffer ITP, which was detected on April 13, 2020, showed a lack of diligence.  <u>Cf. Thermolife Internat'l LLC v. GNC Corp.</u>, 922 F.3d 1347, 1359-61 (Fed. Cir. 2019) (affirming judgment awarding more than one million dollars in attorneys' fees pursuant to 35 U.S.C. § 285 due to a lack of adequate investigation before alleging patent infringement).

<u>Additional Comments</u>.  The reason Ms. Dowling is found to have lacked reasonable basis is because the evidence, taken as a whole, does not provide a

---

[13] The answer to this question is not a potential problem with the statute of limitations.  Ms. Dowling received the allegedly causal Tdap vaccine on January 14, 2020.  Thus, the three-year period set in the statute of limitations was not close to expiring in August 2022.  In any event, the pendency of the statute of limitations is not a factor relevant to an analysis of reasonable basis.  <u>Simmons</u>, 875 F.3d at 636 ("counsel may not use this impending statute of limitations deadline to establish a reasonable basis for Mr. Simmons's claim").

sufficient justification for her claim. This finding is based upon the evidence, or more specifically, the lack of evidence.

From one perspective, the lack of evidence could often derive from an attorney's work. Ms. Dowling did not have expert evidence to support her case because, in part, Mr. Sadaka did not obtain an expert to support the claim.

In Sheller, the Federal Circuit deemed the absence of a report from an expert to be "reasonable." 121 F.4th at 1308. However, the context of that reasonable decision was the pending appeal in Boatmon.

Special circumstances are not present in Ms. Dowling's case. Ms. Dowling has not identified any cases in which petitioners who alleged Tdap caused their ITP have prevailed. Likewise, Mr. Sadaka has not stated that an appellate court opinion pulled the rug out from under Ms. Dowling's case. Instead, Ms. Dowling's case is a run-of-the-mill case in which a petitioner failed to support her case with sufficiently robust evidence to merit a finding of reasonable basis. In such situations, "Fee denials are expected to occur." Chuisano v. United States, 116 Fed. Cl. 276, 286 (2014).

## V.     Conclusion

Ms. Dowling's good faith belief that the Tdap vaccine caused her to suffer ITP is credited. However, "good faith" and "reasonable basis" are separate concepts. Her good faith does not create reasonable basis, which is a finding based upon evidence. The evidence in Ms. Dowling's case does not support a finding of reasonable basis.

Without a finding of reasonable basis, Ms. Dowling is not eligible for an award of attorneys' fees and costs. Therefore, her October 18, 2024 motion for attorneys' fees and costs is DENIED.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

27